## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No.

ERIN MAXWELL

       Plaintiff

v.

ADVANCED STERILIZATION PRODUCTS SERVICES INC., a New Jersey Corporation, and FORTIVE CORPORATION, a Delaware Corporation.

       Defendants

---

## COMPLAINT

Plaintiff Erin Maxwell ("Maxwell"), by and through her counsel, Allen Vellone Wolf Helfrich & Factor P.C., for her complaint against Defendants Advanced Sterilization Products Services, Inc. ("ASP Services") and Fortive Corporation ("Fortive") (collectively, "Defendants"), states as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     Maxwell is a resident of the State of Colorado.

2.     ASP Services is a New Jersey corporation with its principal place of business located at 33 Technology Dr., Irvine, CA 92618.

3.     Fortive Corporation is a Delaware corporation with its principal place of business located at 6920 Seaway Blvd., Everett, Washington 98203.

4.     This controversy arises from retaliatory termination of Maxwell's employment and improper withholding of wages, causing Maxwell losses of well beyond $75,000.00.

5.      There is complete diversity of citizenship between Maxwell and the Defendants, and

the amount in controversy is in excess of $75,000.00. Therefore, this Court has jurisdiction

pursuant to 28 U.S.C. § 1332(a).

6.      A substantial part of the events and omissions giving rise to Maxwell's claims

occurred in the State of Colorado. Venue is therefore proper in the United States District court for

the District of Colorado pursuant to 28 U.S.C. § 1391(b)(2).

## BACKGROUND AND GENERAL ALLEGATIONS

7.      ASP Services is a medical devices company that provides infection prevention

services. ASP Services is a subsidiary of Fortive. ASP Services markets and sells sterilization and

high level disinfections products, as well as software which enhances instrument tracking products.

8.      ASP Services does this in conjunction with another Fortive subsidiary, Advanced

Sterilization Products, Inc. ("ASP").

9.      ASP Services and ASP[1] work in conjunction with one another and are collectively

referred to as the "ASP Entities."

10.     Maxwell previously served as the Regional Sales Director for the Mountain South

region for both ASP Entities and Fortive.

11.     Payment for Maxwell's employment with the ASP Entities and Fortive came from

ASP Services.

12.     Maxwell had been employed with the ASP Entities and Fortive's predecessor,

Johnson and Johnson, in sales of sterilization products since 2012, and had been a top performer

throughout her career with the companies.

---

[1] Maxwell has also brought a related suit against ASP at 1:22-cv-00894-SKC.

13. Maxwell was terminated from employment by the ASP Entities and Fortive at the end of 2021.

14. She was terminated as a result of her filing a Speak Up complaint pursuant to the Fortive "Speak Up" Roadmap, one of several complaints Maxwell had raised throughout 2021 regarding company activities.

15. The "Speak Up" Roadmap is part of the personnel policies utilized by the ASP Entities and Fortive to ensure that its employees are able to raise concerns regarding, *inter alia*, company standards of conduct, or possible legal or regulatory violations, without fear of retaliation by the ASP Entities or Fortive for doing so.

16. In addition to the "Speak Up" Roadmap, these assurances exist in various provisions of the ASP US Employee Handbook (the ASP Employee Handbook), the Fortive Standards of Conduct a/k/a the Fortive Code (the "Standards of Conduct"), and Defendants' policy entitled US Government Contracting Code of Business Ethics and Conduct Supplement to the Fortive Code (the "Code of Ethics").

17. Pursuant to the "Speak Up" program as set forth in the Employee Handbook:

> Employees are encouraged and expected to ask questions when unsure about any integrity or compliance issue, and are required to report actual or potential violations of law, our Standards of Conduct or other ASP policy. In bringing questions or violations to a manager's attention, you help to ensure ASP achieves and sustains the highest levels of integrity and compliance, and you are help [sic] build the foundation of our future success.

18. Similarly, the Code of Ethics states that "ASP employees are responsible for adhering to the standards set forth in this policy. . . . Employees have a duty not only to comply

with applicable law and ASP policies, but to report any information that suggests that a violation

may occur or has occurred."

19.    The consequences of violating the Code of Ethics and the Fortive Code as a whole,

are the same—"namely, violations will result in appropriate disciplinary action up to and including

termination."

20.    In addition, the "Speak Up" Roadmap provides that the ASP Entities and Fortive

have "zero tolerance for retaliation against any associate who has raised a concern in good faith

regardless whether a report uncovers any actual misconduct."

21.    Similarly, the Standards of Conduct encourage employees to "Speak Up!" in

reliance on Defendants' no-retaliation policy, proclaiming among other things:

    a.   "We are Courageous. As employees, we face problems head on and promptly
report any behavior that we believe violates our Core Values or our Code,
knowing that Fortive will not tolerate retaliation."

    b.   Instructing managers to "Remind them of our zero-tolerance policy on
retaliation."

    c.   "**Don't Fear Retaliation**. Regardless of the resource you contact, know that
your concern will be handled promptly and appropriately. Fortive absolutely
prohibits retaliation against anyone who makes a report or participates in an
investigation."

22.    The Code of Ethics provides similar promises:

> ASP employees who report violations and potential violations will
> be treated with respect. ASP's Compliance Team will lead all
> investigations of alleged violations or misconduct with fairness and
> impartiality. As explained above, employees are expected to fully
> cooperate in internal investigations. ASP employees will never be
> penalized for reporting in  good faith. A violation of ASP's non-
> retaliation policy will lead to discipline, including termination. If
> you suspect someone is retaliating against you, you should contact
> one of the resources above.

23.     The ASP Employee Handbook also provides that "retaliation is strictly prohibited," and that "ASP prohibits retaliation against any employee who, in good faith, reports potential or actual violations of the Equal Employment Opportunity policy, Anti-Harassment and Non-Discrimination policy, Standards of Conduct, or applicable law."

24.     A violation of the ASP Entities and Fortive's non-retaliation policy will lead to discipline, including termination for those who engage in such violations. If an employee suspects someone is retaliating against them, the employee is encouraged to contact one of several resources.

25.     The ASP Entities routinely contract with the Department of Defense, the Department of Veterans Affairs, and other federal, state, and local departments and agencies. Collectively, Defendants are a government contractor which is subject to key legal compliance requirements.

26.     Relevant here, Defendants' Code of Ethics explains:

> In connection with contract awards and modifications, the government may require ASP to provide historical pricing information (including commercial sales practices and government sales history) to allow it to compare such information to the pricing offered by ASP and to negotiate a "fair and reasonable" price.

27.     As a government contractor leading up to and during 2021, the ASP Entities regularly reported their historic commercial sales pricing information for the government to use to negotiate a fair and reasonable price.

28.     According to Defendants' Code of Ethics, "ASP must ensure that [this pricing] information provided to the government is current, accurate, complete, and not misleading . . . ."

29.     Defendants acknowledge in this same policy that the Anti-Kickback Act of 1986, is defined very broadly to forbid "prime contractors [like the ASP Entities] and subcontractors from

offering, soliciting, providing, or accepting anything of value to obtain or reward favorable treatment in connection with the award or performance of U.S. government prime contracts and subcontracts."

30.    Defendants knew that an unwarranted or excessive discount for a customer trade-in unit could conceal the true price of a transaction and mislead the government in its negotiations for a fair and reasonable price in violation of the Anti-Kickback statute.

31.    Accordingly, the ASP Entities set in place policies and procedures that—on their surface—were intended to ensure that discounts for trading in used equipment by commercial customers did not exceed the equipment's fair market value, including the following:

    a.    Maintaining a process for compliance to review discounts including trade-ins to ensure they were proper;

    b.    Requiring discounts to be based on an arm's length transaction;

    c.    Requiring the discount for a trade in be no more than fair market value;

    d.    Requiring the traded-in units to be no more than 10 years old (end of life);

    e.    Requiring the used equipment to be in working order;

    f.    Requiring the customer to have good and marketable title to the equipment being traded in; and

    g.    Maintaining a process for picking up the equipment.

32.    The ASP Entities and Fortive also knew that the Anti-Kickback statute could be violated by employees who skirted the internal approval process for price discounts or who retroactively applied promotional prices to customers' past purchases.

33.    Accordingly, the ASP Entities set in place policies and procedures that—on their surface—were intended to ensure that price discounts were pre-approved and not applied retroactively, including the following:

    a.   Maintaining a process for price pre-approval;

    b.   Requiring the sale force to follow the process for price pre-approval;

    c.   Disallowing unapproved pricing outside of established promotional prices or delegation of authority;

    d.   Prohibiting discounts to induce future purchases;

    e.   Disallowing promotional pricing to be applied retroactively to customers' past purchases; and

    f.   Requiring supervisory approval for trade ins.

34.    These policies and procedures were important to ensure that the commercial sales information provided to the government (so it could negotiate a fair and reasonable price for the same products) was accurate, complete, and not misleading.

35.    Through their policies, the ASP Entities and Fortive impressed upon Maxwell the point that these requirements were to be taken very seriously.

36.    Previously, in 2017, Maxwell filed a Qui Tam Complaint in the United States District Court for the Eastern District of Pennsylvania under the Civil False Claims Act, 31 U.S.C. §§ 3729-33 ("Qui Tam Action") against ASP and Johnson and Johnson, among other entities, as related to false representations and certifications to the United States Government in conjunction with a Federal Supply Schedule contract. The Complaint itself was initially filed under seal.

37.    While the Qui Tam Action was still pending, in 2018, Fortive purchased the ASP Entities from Johnson and Johnson.

38.    The United States Government eventually declined to step in and pursue the Qui Tam Action, such that said Action listing Maxwell as plaintiff was unsealed on March 15, 2021, and then served on ASP on June 1, 2021. Thus, between March and June 2021, Maxwell's name and involvement in the Qui Tam Action became public to Fortive and the ASP Entities.

Maxwell's claims were referenced in Fortive and ASP reports, shareholder meeting minutes and other internal documentation.

39.    Additionally, upon information and belief, Fortive used the Qui Tam Action and claims made thereunder to look into the ASP Entities' processes and procedures, to attempt to correct mistakes moving forward.

40.    Between February and March 2021, Maxwell again raised compliance concerns, this time with her superior Doug Brooks ("Brooks") related to an offer of pricing made by another ASP Entities employee, the Corporate Accounts Director Andrew Davis ("Davis"). Among other things, Maxwell was concerned that Davis was falsely claiming approval for discounts where he had not followed the mandatory approval process. The transactions involved a "tracking customer," who had an existing contract at a higher price point that served as benchmark for government pricing. Maxwell believed that Davis was misrepresenting facts and skirting the approval process in a manner that would falsify the company's certification of commercial sales practices and pricing to the government. Maxwell was concerned that the ASP Entities and Fortive might be running afoul of the Anti-Kickback statute. Moreover, because she was being asked to apply the questionable pricing for accounts for her sales force, she faced a risk of being found complicit if the ASP Entities and Fortive were violating federal law. Maxwell would not align with the discounted price before it was approved and requested a further discussion. Brooks responded brusquely that the decision was allegedly in the best interest of the business and that Maxwell needed to align on the discounted price point "even if [she] didn't like it."

41.    Maxwell also reported concerns to Brooks that she was the subject of harassment by other ASP employees as a result of her reporting compliance concerns.

42.     Brooks informed Maxwell that he would look into her concerns.

43.     After reporting her these concerns, and shortly after Maxwell's Qui Tam Complaint was served on ASP, Brooks and Elle Wilson ("Wilson"), a Human Resource Department ("HR") representative, retaliated against Maxwell, which retaliation included Brooks alleging in June 2021 that Brooks had "received complaints" regarding certain behavior of Maxwell.

44.     The only follow up on the alleged complaints against Maxwell occurred in August 2021, wherein she was informed by Brooks that the concerns previously communicated to her had been fully resolved. Indeed, between June through her termination, no performance related concerns were ever addressed with Maxwell.

45.     Between August and December 2021, Maxwell again encountered sales-related activity by Davis that violated Defendants' policies and procedures, and signified possible violations of the Anti-Kickback Act of 1986.

46.     On August 10, 2021, a commercial customer was replacing two old units with new ones. The ASP Entities quoted a  price consistent with the relevant tracking entity's contract provided to the government to inform price negotiations (the "Quote"). The old units were over 10 years old with no fair market value. Since the aged units did not qualify for trading in, the ASP Entities through Account Manager Melissa Linderman ("Linderman") offered as a courtesy to pick up and to recycle the old units for free (instead of charging for disposal, a service that Defendants valued at $2,500 per unit).

47.     On August 30, 2021, the customer emailed Davis asking whether the Quote reflected the ASP Entities' best price.

48.    According to Davis, the customer was requesting a competitive quote from their chief competitor. Davis wanted to lower the price for the customer to secure future business. However, instead of simply lowering the price by $75,000, Davis wanted to couch the lower price as (1) compensation for aged equipment traded in (most of the discount); and (2) as part of a group-buy price that was not yet in effect (a smaller fraction of the discount). Upon information and belief, Davis wanted the ASP Entities and Fortive to maintain their relationship as a government contractor, but keep the government from capitalizing on this customer's highly favorable price.

49.    The sale went forward without the $75,000 discount.

50.    After the new units had been shipped, Davis circled around to Linderman to find out which units would be part of the "courtesy pick-up." Defendants' policies and procedures use the term "courtesy pick-up" exclusively for situations where the customer is not trading in aged equipment.

51.    On October 27, 2021, the ASP Entities issued a De-Install Authorization Letter for a courtesy pick-up of the customer's two units. The units were picked up and disposed in a landfill.

52.    By October 28, 2021, Davis had made one or more commitments to the customer to discount the price and intended to provide the customer with a retroactive credit.

53.    On October 28, 2021, Maxwell texted Davis asking whether ASP Entities' Contract & Pricing Committee ("CPC") had approved crediting the customer. Davis responded, "I was not concerned with CPC approval, that's a given for this situation based on my early email commitment to the customer. Evelyn [Young] (Davis's supervisor) and Doug [Brooks] (Maxwell's supervisor) are aligned . . . ." Davis went on to say he would submit the CPC request.

54.     During the approval process, Davis falsely portrayed Linderman as having quoted a higher price because she was unsure whether the customer was trading in units.

55.     Linderman complained to Maxwell that she had compliance concerns based on Davis's mischaracterization of the facts relating to the sale.

56.     Based on Linderman's complaint about Davis, Maxwell was concerned that if she did not say anything she could be found complicit in violating the Anti-Kickback Act. She was also concerned that she would be subject to retaliation based on what happened after her March 2021 complaint about Davis and after her Qui Tam Complaint became public.

57.     Between November 9 and December 13, 2021, Maxwell proceeded to raise her compliance concerns on behalf of herself and Linderman, saying among other things that Davis's sales practices (seeking unwarranted trade ins, not getting pre-approval for discounts, and offering promotional price before they became available) violated the Anti-Kickback Act, including by:

      a.     On November 9 texting Brooks that 'what [Davis] wrote is not accurate' and that she was speaking up despite being "afraid of potential backlash for voicing compliance concerns"

      b.     On November 9, 2021, explaining her compliance concerns to Brooks over the phone;

      c.     On November 16, 2021, speaking with Fortive Regional Compliance Leader, Ximena Cajas Gonzalez ("Cajas"),[2]

      d.     On November 17, 2021 speaking with Wilson from Human Resources;

---

[2] Defendant Fortive was directly involved with and aware of all relevant aspects of Maxwell's complaint. Internal records reveal that Maxwell's complaint was lodged in the Fortive system on November 11, 2021 by Fortive employee Julianne Woods concerning "[a]llegations of violation of policies regarding sales programs, inappropriate workplace conduct." The complaint noted Maxwell as the reporter. Additionally, the complaint was assigned to Thomas Lynch, the former Chief Compliance Officer of Fortive responsible for oversight of the ASP Entities.

e.    On November 20, 2021, filing a Speak Up! complaint through the Fortive Hotline; and

f.    On November 22, meeting with Cajas a second time.

58.    In her complaints, Maxwell stated, among other things, that:

a.    Davis's submission for approval of the trade in credit was not accurate;

b.    She and Linderman did not provide a trade-in value quote for the customer because the units being returned did not have fair market value;

c.    The units were 11 and 12 years olds (meaning they did not qualify for trade-ins);

d.    The units had been leased (also indicating they did not qualify for trade-in);

e.    Davis offered prices without approval;

f.    Davis's offered promotional group pricing before it was available;

g.    Davis was offering prices in violation of a provision against local deals in the tracking customer's contract;

h.    Davis tried to circumvent CPC approval;

i.    She had been retaliated against previously and was concerned about further retaliation for what she was reporting; and

j.    She was concerned about being complicit with violations of the Anti-Kickback Act if she did not speak up.

59.    Before speaking with Maxwell, Cajas stated that "Confidentiality is guaranteed as well as non-retaliation." Cajas—a Fortive employee who also worked for the ASP Entities—spoke with Maxwell on behalf of all Defendants. During their phone call, Cajas displayed understanding of Maxwell's complaint, affirmed that CPC had to do "fair market values exercises" for trade-ins "because otherwise it could be seen or perceived as inducement" under the Anti-Kickback laws, and agreed that the units' fair market value would most likely be "zero" based on their age and that Maxwell had a "good point" that leased units could not be traded in. Cajas also agreed that

the company could not go and talk to customers to let them know a price was coming that had not yet been approved. Afterward, Maxwell sent Cajas documentation supporting her allegations including the age of the units.

60.     Meanwhile, Davis pressed forward with the approval process for the bogus trade-in using false and misleading information. Cajas was a member of the CPC team responsible for deciding whether to approve Davis's request for the trade-in credit. Based on what she had told Maxwell, Cajas knew that Davis's credit request was bogus, but she chose not to interfere with CPC's approving it. For example, as the compliance officer on the CPC, she was responsible to calculate whether the fair market value of the aged units supported the credit. She either did not perform this analysis or chose to ignore it.  Cajas chose to approve the $75,000 credit request despite knowing it was bogus.

61.     Others working for the ASP Entities were less duplicitous than Cajas. On November 17, 2021, Maxwell spoke with Wilson in human resources. Maxwell raised all of her concerns, her fear of retaliation, and the response of the company, including Brooks' attitude toward compliance. Wilson stated that Brooks' attitude was unlikely to change. She candidly asked Maxwell whether she would be interested in an "exit plan" to leave the company.

62.     As Maxwell perceived retaliation was continuing, and having no other choice, she submitted a Speak Up! Complaint on November 20, 2021, which detailed her prior reporting of compliance concerns.

63.     Internal records reveal that the November 20, 2021 complaint was expressly lodged with Fortive for "Retaliation or Retribution."

64.     On November 22, 2021, Maxwell met with Cajas by phone who was now charged with investigating the November 20 Speak Up Complaint. Cajas informed Maxwell not to submit any further "Speak Up" complaints. She also informed Maxwell that she would conduct an investigation of the complaint, and report back to Maxwell. She never did. Instead, Maxwell became aware on December 13 that the trade in credit referenced above had been approved by the company. The investigation conducted by Fortive and the ASP Entities was done at the direction of Fortive representatives and/or with Fortive representatives advising the ASP Entities on how to move forward.

65.     The investigation by Fortive and the ASP Entities uncovered wrongdoing and showed that Maxwell's complaints were valid.

66.     Fortive and the ASP Entities should have disclosed these issues to the United States Government. However, any violations caused by the ASP Entities may have necessarily affected Fortive's revenue and also subjected it to government fines. So, instead, they chose to cover up Maxwell's allegations and to remove Maxwell from the company.

67.     Cajas covered up Maxwell's complaint by drafting a false and misleading investigative report. The reported failed to fairly or accurately describe Maxwell's complaint and misrepresented Cajas's personal conclusions based on what she had said orally to Maxwell.

68.     Maxwell was terminated from her position on December 17, 2021 in a telephone call with Brooks and Estelle Pellegrino ("Pellegrino") of HR, who at that point had held her HR position for approximately one week. Her termination was effective December 31, 2021.

69.     Maxwell was told that the company was eliminating her Regional Sales Director position. No performance issues were referenced.

70.    Maxwell inquired into whether this termination related to her Speak Up complaint. Brooks didn't answer. Pellegrino said, "we have a fair process."

71.    At that time of her termination, Maxwell was presented with a Separation Agreement and General Release, which purports to provide her the same severance pay as provided to any other employee pursuant to the Salaried Employees Severance Pay Plan of Fortive Corporation.

72.    As Maxwell was tendered a Separation Agreement at the time of her separation, her termination is presumed to be without cause.

73.    Moreover, given Fortive's involvement in the investigation of Maxwell's complaints, as well as its previous knowledge of Maxwell's Qui Tam Action, it is apparent that Fortive also directed the ASP Entities to retaliate against Maxwell and improperly terminate her employment to protect itself and the ASP Entities.

74.    The pricing and anti-kickback complaints raised by Maxwell during 2021 fell squarely within the compliance requirements imposed on the ASP Entities as outlined in its Code of Ethics, and in the underlying policies and guidance of the ASP Entities, including the 2021 H2 Pricing & Promotions policies. Her reporting of retaliation for raising these issues was also done in a manner consistent with reporting policies set forth in the Code of Ethics, as well as the Fortive Speak Up complaint system.  For doing so, Maxwell was fired.

75.    Upon information and belief, the ASP Entities subsequently was subject to an audit that revealed, and/or self-reported violations that related to, issues brought to ASP's and Fortive's attention by Maxwell implicating the False Claims Act and reporting thereunder.  Such information lends further credence to Maxwell's complaints as further outlined herein.

76.    Maxwell subsequently determined that a number of new Regional Sales Manager positions were created in her region, and that her Regional Sales Director position has not been eliminated.

77.    Instead, the job description for the Regional Sales Manager is nearly identical to the one for Maxwell's prior role as Regional Sales Director. Moreover, three other Regional Sales Directors have been promoted to Area Vice Presidents, a newly created title in the sales organization.

78.    As a result of her wrongful and unjustified termination from employment, Maxwell has suffered and will continue to suffer lost income and other damages, both pecuniary and non-pecuniary, which includes anticipated salary and commissions for calendar year 2022, the value of her anticipated annual and one time equity awards for the year, the value of any cancelled stock options or RSUs lost as a result of her termination, and compensatory damages relating to the distress, worry and other emotional consequences of abruptly losing her job in this manner.

79.    In addition to the damages caused by Maxwell's wrongful and unjustified termination from employment, Maxwell is owed earned, vested and determinable compensation through the date of her termination. This includes 1) Sales Incentives/Awards relating to calendar year 2021 valued at up to $25,000, 2) commissions for capital orders valued at approximately $2.7m expected to ship in December, 2021 upon which Maxwell is entitled to commissions under her commission plan, which provides for commissions on product payments received thirty days past her separation date, and 3) 2021 commission reconciliations, which are typically paid in March.

## FIRST CLAIM FOR RELIEF
### (Breach of Implied Contract—both Defendants)

80.     Plaintiff re-alleges and incorporates by reference the forgoing paragraphs as though fully set forth herein.

81.     As part of her employment, Plaintiff was subject to Fortive Standards of Conduct and the Fortive "Speak Up" Roadmap. ASP Services further implements the US Government Contracting Code of Business Ethics and Conduct, which outlines its key compliance requirements.

82.     The personnel policies utilized by both ASP Services and Fortive ensure that employees are able to raise concerns regarding, *inter alia*, company standards of conduct, or possible legal or regulatory violations, without fear of retaliation by ASP Services or Fortive for doing so.

83.     Defendants and ASP are subject to the provisions of the Standards of Conduct, "Speak Up" Roadmap, and Contracting Code.

84.     By implementing the various policies and procedures, and further informing Plaintiff that Defendants and ASP would investigate and take action in response to Plaintiff's concerns and complaints, Defendants demonstrated a willingness to be bound by its policies and procedures, including the Standards of Conduct and "Speak Up" Roadmap.

85.     The policies and procedures implemented by Defendants and ASP, as well as the Code of Business Ethics and Conduct, imposed a duty on Plaintiff to notify them of any violations of such policies and procedures, and further created an implicit contract or promise that Defendants and ASP would not retaliate against the individual who had notified management of such violations.

86.   Plaintiff reasonably understood that Defendants and ASP were offering these policies as part of the terms, conditions and duties of her employment with them.

87.   Defendants breached their implied contract and promise of protection against retaliation by terminating Plaintiff for complying with the requirement to report violations of such policies and procedures.

88.   Additionally, Defendants breached this implied contract and "Speak Up" and Standards of Conduct policies and protections described herein by directing and allowing one or more other Defendants or ASP to retaliate against Plaintiff and terminate her employment for reporting violations of Defendants' and ASP's policies and procedures.

89.   Until her termination, Plaintiff performed her duties in a satisfactory manner.

90.   As a result of Defendants' breach, Plaintiff has suffered and continues to suffer damages in amounts to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Wrongful Termination—both Defendants)

91.   Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

92.   During the course of her employment with Defendants, Plaintiff internally objected to illegal practices in which she believed the Defendants were engaging.

93.   Both Defendants were aware of these various complaints.

94.   In particular, Plaintiff raised internal objections to her supervisors relating to the Defendants' and ASP's noncompliance with anti-kickback statutes, the False Claims Act, and the laws and regulations governing the reporting of commercial sales and pricing in order to permit

the government to negotiate a fair and reasonable price with government contractors like Defendants.

95.    Plaintiff engaged in protected activities by bringing to Defendants' attention government compliance concerns, including the submission of a Speak Up Complaint directly to Fortive through its system, in accordance with company policies.

96.    Defendants and ASP terminated Plaintiff as a direct and proximate result of her reporting her concerns and filing her complaint regarding the government compliance concerns as set forth above.

97.    Defendants' termination of Plaintiff's violates established public policy of the State of Colorado that an employer may not retaliate against an employee who attempts to prevent an employer's participation in an act that violates a law or rules and regulations of the United States. *See, e.g., Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 111 (Colo. 1992) (under public-policy exception, "employees should not be forced to choose between losing their jobs or engaging in criminal conduct" under federal law). Here, Maxwell was fired because of reporting and refusing to participate in one or more violations of Federal Acquisition Regulation ("FAR") 52.203-13 - Contractor Code of Business Ethics and Conduct, the Anti-Kickback Act of 1986, 41 U.S.C. § 51 *et seq.*, and the False Claims Act, 31 U.S.C. § 3729 *et seq.*

98.    Plaintiff had a right or duty based upon expressed public policy to object to what she believed in good faith was illegal activity as described more fully herein.

99.    Defendants were aware or reasonably should have been aware that Plaintiff's actions were legally protected.

100.    Defendants and ASP terminated Plaintiff in retaliation of Plaintiff having complied with her legal and ethical duties, as detailed in the sources of public policy outlined above.

101.    Defendants' termination of Plaintiff violated public policy.

102.    The actions of Defendants were willful and wanton, and/or were done with malice or with reckless indifference to Plaintiff's protected rights.

103.    As a result of Defendants' wrongful termination of Plaintiff in violation of public policy, Plaintiff suffered and continues to suffer damages in the amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
**(Violation of Colorado Wage Claim Act, C.R.S. § 8-4-101, *et. Seq*—ASP Services)**

104.    Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

105.    At all material times, ASP Services has been an "employer" within the meaning of the Colorado Wage Claim Act.

106.    Plaintiff was an employee of ASP Services within the meaning of the Colorado Wage Claim Act.

107.    Pursuant to the provisions of C.R.S. § 8-4-109(3), Plaintiff made written demand for payment of wages or compensation.

108.    Despite this demand, ASP Services has failed and refused to pay Plaintiff all earned, vested and determinable wages or compensation for labor or services, including sales incentives/awards and commissions.

109.    Defendant's failure to pay wages owed is willful and wanton.

110.    As a result of the foregoing, Plaintiff is entitled to statutory penalties pursuant to C.R.S. § 8-4-109(3)(b) and (c)**.**

111.    As a consequence of the foregoing, Plaintiff is also entitled to recover her attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF
### (Violation of the False Claims Act, 31 U.S.C. § 3730(h)—both Defendants)

112.    Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

113.    Plaintiff was retaliated against and terminated from her employment in retaliation for her efforts to investigate and report actions that she reasonably believed constituted fraud against the government by Defendants and ASP.

114.    Plaintiff is an individual who has engaged in protected activity as set forth in 31 U.S.C. § 3730(h).

115.    Defendants were aware that Plaintiff engaged in activity protected by 31 U.S.C. § 3730(h), and took one or more adverse employment actions against Plaintiff based on her engagement in protected activity under 31 U.S.C. § 3730(h).

116.    Defendants' retaliatory acts are in violation of 31 U.S.C. § 3730(h).

117.    As a result of Defendants' violation, Plaintiff has suffered and continues to suffer damages in amounts to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Violation of the 41 U.S.C. § 4712—both Defendants)

118.    Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

119.    Plaintiff was retaliated against and terminated from her employment in retaliation for her efforts to investigate and report actions that she reasonably believed constituted fraud against the government by Defendants and ASP.

120.    However, under 41 U.S.C. § 4172(a)(1), "[a]n employee of a contractor, subcontractor, grantee, or subgrantee or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant…"

121.    Defendants and ASP are contractors, subcontractors, grantees, subgrantees or personal services contractors within the meaning of Section 4712.

122.    Maxwell was an employee of ASP Services, and made her multiple reports to a "management official or other employee of the contractor, subcontractor, grantee, or subgrantee who has the responsibility to investigate, discover, or address misconduct." 41 U.S.C. § 4712(a)(2)(G).

123.    Therefore, Defendants' retaliatory acts are in violation of 41 U.S.C. § 4712.

124.    As a result of Defendants' violation, Plaintiff has suffered and continues to suffer damages in amounts to be proven at trial.

### SIXTH CLAIM FOR RELIEF
### (Civil Conspiracy)

125.    Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

126.    The Defendants and ASP agreed by words or conduct to accomplish an unlawful goal and/or to accomplish a goal through an unlawful means.

127.    One or more unlawful acts were performed to accomplish the goal and/or one or more acts were performed to accomplish the unlawful goal.

128.    Plaintiff was damaged because of the acts that Defendants and ASP performed to accomplish the goal.

WHEREFORE, Maxwell prays for relief as follows:

A.    Judgment against Defendants on all claims asserted against them;

B.    An award of backpay and front pay in an amount to be determined at trial;

C.    Unpaid wages and other benefits in an amount to be determined at trial;

D.    Statutory penalties under Colorado Wage Act, C.R.S. § 8-4-109 (3)(b) and (c);

E.    An award of attorneys' fees and costs pursuant to C.R.S. § 8-4-110 and 31 U.S.C. § 3730(h)(2);

F.    Two times the amount of back pay pursuant to  31 U.S.C. § 3730(h)(2);

G.    Pre- and post-judgment interest; and

H.    Such other relief deemed just and reasonable.

**PLAINTIFF DEMANDS A JURY ON ALL ISSUES SO TRIABLE**

DATED this 15th day of December, 2023

Respectfully submitted,

s/ James S. Helfrich
James S. Helfrich
Jennifer E. Schlatter
Bailey C. Pompea
ALLEN    VELLONE    WOLF    HELFRICH    &
FACTOR P.C.
1900 Stout Street, Suite 1900
Denver, CO  80202
Telephone:  303-534-4499
Fax:  303-893-8332
jhelfrich@allen-vellone.com
jschlatter@allen-vellone.com
bpompea@allen-vellone.com

ATTORNEYS FOR PLAINTIFF